**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| Scott Kirk, | ) |
| | ) |
| Plaintiffs, | ) Case No. 1:14-CV-713 |
| | ) |
| vs. | ) |
| | ) |
| Craig Hockenberry, et al., | ) |
| | ) |
| Defendants. | ) |

O R D E R

This matter is before the Court on the motion for summary judgment filed by Defendants Craig Hockenberry and Manchester Local School District Board of Education. Doc. No. 14. For the reasons that follow, Defendants' motion for summary judgment is well-taken and is **GRANTED.**

I. Background

Plaintiff Scott Kirk was employed by the Manchester Local School District Board of Education ("the School Board") as the Supervisor of Facilities and Transportation from 2006 to 2013. In this capacity, Plaintiff was responsible for supervising the upkeep and maintenance of all the School District's buildings and grounds as well as all of its school bus drivers. Plaintiff worked for the School Board under a series of contracts, the most recent of which was a three-year agreement he signed in March 2013 to cover the period from July 1, 2013 to June 30, 2016.

On July 1, 2013, the School Board hired Defendant Craig Hockenberry to become the new superintendent of schools to replace the incumbent, Robert Ralstin, who had

retired. Hockenberry's term, however, did not officially begin until July 29, 2013. The School Board appointed Lowell Howard, who was the Superintendent of the South Central Ohio Educational Service Center, as the interim superintendent of the School District upon Ralstin's retirement.

During the first week of July 2013, the Treasurer of the School District, Karen Ballengee, received a number of written complaints from Plaintiff's subordinates and others about Plaintiff's conduct as the facilities supervisor. The allegations included:

1. Calling Rich Arnold "Mormon Boy;"

2. Calling Dan Sheridan "Preacher Dan" and "Church Boy;"

3. Telling employees, "If you like me you'll work and if you don't, you don't work;"

4. Referring to some female employees as "cunts;"

5. Hiding the keys to the "Gator" - a motorized utility vehicle - so that the coaching staff could not use it.

6. Hiding a contractor's pallet jack;

7. Showing videos of some bus drivers to other employees in order to make fun of them;

8. Swearing during in-service meetings and swearing near open classrooms;

9. Mismanaging the buildings and athletic grounds;

10. Not building positive relationships with staff members;

11. Having conflicts of interest in awarding contracts;

12. Calling Jeannie Justice "Granny" and telling her she was too old to do jobs she had always done, such mowing and weed-eating;

13. Swearing at a cleaning products salesman and then throwing his products into a dumpster; and,

14. Generally creating an intimidating work environment.

<u>See</u> Doc. No. 14-1.  There were also allegations that Plaintiff conducted personal business on School District time, used a School District vehicle to retrieve a deer carcass, and had the windows of his truck tinted on school grounds by a contractor who was doing other work for the School District at the time.  Hockenberry Dep. (Doc. No. 13-2) at 76.

Ballengee notified Hockenberry and Howard of these complaints.  On July 15, 2013, Hockenberry and Howard met with Plaintiff and informed him of the general nature of the complaints against him.  Hockenberry told Plaintiff that he would be placed on administrative leave, with pay, while he investigated the complaints.  Hockenberry interviewed complainants both before and after this meeting.  Hockenberry testified that he first wanted to focus the investigation on the allegations indicating that Plaintiff was creating a hostile work environment for his subordinates.  Hockenberry believed that these allegations were the most serious.  He then wanted to investigate the allegations implicating potential criminal misconduct, such as theft of time and misusing School District property.  <u>Id.</u> at 58-92; 146-48.

Hockenberry and Plaintiff had a second meeting on July 31, 2013.  Hockenberry testified that the purpose of the meeting was to review the allegations with Plaintiff and give him an opportunity to respond to them.  Hockenberry testified that he wanted to start by reviewing the hostile work environment allegations but that Plaintiff kept interrupting him to ask if he was going to call the police.  Hockenberry testified that Plaintiff abruptly asked what would happen if he resigned.  Hockenberry told Plaintiff that if he resigned there would be no need to contact the police.  According to Hockenberry, Plaintiff then offered to resign. Ballengee, who was also at the meeting, typed up a resignation letter for Plaintiff which he took home, signed, and returned a few days later.  <u>Id.</u> at 166-79.  Two weeks later, at the

3

next scheduled meeting of the School Board, Hockenberry recommended that the Board accept Plaintiff's resignation. The Board accepted Hockenberry's resignation. Id. at 29-30.

Plaintiff's version of the July 31 meeting is quite different. Plaintiff testified that he was summoned to Hockenberry's office rather unexpectedly and that he had little or no time to prepare for the meeting. Plaintiff testified that Hockenberry never gave him an opportunity to respond to the allegations or present his version of events. Instead, Plaintiff testified, Hockenberry presented him with a letter of resignation that had already been prepared. Hockenberry told Plaintiff that if he did not resign, he had been instructed by the School Board to terminate him. Plaintiff told Hockenberry that he would not sign the resignation letter at that point in time. Hockenberry responded that he would not pursue criminal charges if Plaintiff signed the resignation letter. Plaintiff took the letter home, discussed the situation with his wife, then signed and returned the resignation letter four or five days later. Plaint. Dep. (Doc. 13-1), at 151-76.

Plaintiff also claims that during this meeting Hockenberry made a statement to the effect that "we have problems here with this district about your religious beliefs." Plaint. Dep. at 13-1, at 156. Plaintiff admitted that he could not remember the exact words used by Hockenberry but interpreted his comment to mean that a person with his religious beliefs was not welcome to work in the School District.[1] Id. at 156-171. Hockenberry denied making any comments about Plaintiffs religious beliefs or preferences. Hockenberry Dep. at 160-61. Ballengee testified that Hockenberry told Plaintiff that "he [Plaintiff] cannot

---

[1] Plaintiff testified that he sometimes went to a Presbyterian church with his family, but that he is not particularly religious and "had questions" about religion. Plaint. Dep. at 70, 170.

4

dictate what someone's religion is" and that "it doesn't matter what their religion is to work here." Ballengee Dep. (Doc. No. 13-3), at 183.

In September 2014, Plaintiff filed a complaint asserting various federal and state law causes of action against Hockenberry and the School Board. Count One alleges that Defendants violated Plaintiff's due process rights under the Fourteenth Amendment by terminating him without a hearing and a meaningful opportunity to be heard. Count Two asserts a "stigma-plus" due process claim alleging that Defendants denied Plaintiff of his good name and reputation by accusing him of criminal conduct in the course of terminating his employment. Count Three alleges that Defendants violated state law by not following the procedural requirements of Ohio Rev. Code § 3319.16 before terminating him. Count Four is a state law breach of contract claim. Count Five alleges that Defendants violated the Fifth Amendment's Takings Clause by breaching his employment contract. Finally, Count Six alleges that Defendants violated the First Amendment's Establishment Clause and Free Exercise Clause by conditioning Plaintiff's employment on his adherence to their religious beliefs.

Following the conclusion of discovery, Defendants moved for summary judgment on each of Plaintiff's claims. Defendants' motion has been fully briefed and is ready for disposition.

## II. Summary Judgment Standard of Review

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An assertion of a undisputed fact must be supported by citations to particular parts of the record, including depositions, affidavits, admissions, and

5

interrogatory answers. The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (internal quotation omitted).

The Court is not duty bound to search the entire record in an effort to establish a lack of material facts. Guarino v. Brookfield Township Trs., 980 F.2d 399, 404 (6th Cir. 1992). Rather, the burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment," Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute. Anderson, 477 U.S. at 250. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor. United States v. Diebold Inc., 369 U.S. 654, 655 (1962).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250. "If the evidence is merely colorable, . . . or is not significantly probative, . . . the court may grant judgment." Anderson, 477 U.S. at 249-50 (citations omitted).

III. <u>Analysis</u>

Defendants argue that in order for Plaintiff to prevail on his first five causes of action, he must demonstrate that they improperly terminated his employment. Defendants contend, however, that even construing the record in Plaintiff's favor, the evidence shows that he was not terminated but rather voluntarily resigned his employment. Defendants argue that Plaintiff's resignation was voluntary even though, according to him, he was faced with the unenviable choice of resigning or being involuntarily terminated with the prospect of a further criminal investigation into his conduct. As to Count Six, Defendants argue that Plaintiff has no evidence of any policy of theirs that would constitute an endorsement of religion, and, to the extent Plaintiff might be alleging a violation of the Free Exercise Clause, he cannot point to any evidence showing that they substantially burdened his free exercise of religion. Specifically, Defendants point out that Plaintiff has no evidence that anyone employed by the School District, including Hockenberry, were even aware of his religious beliefs. Defendants also point out that Plaintiff cannot even recall what Hockenberry actually said that was supposed to have been a negative reference to his religious beliefs. Hockenberry also contends that he is entitled to qualified immunity on all of Plaintiff's constitutional claims.

For his part, Plaintiff admits signing and submitting the resignation letter. Plaintiff, however, contests that his resignation was voluntary. Plaintiff contends that he was constructively discharged and/or coerced into resigning because his termination was imminent. Plaintiff specifically denies that he created a hostile work environment for his employees and contends that the time he spent on personal business at work was de minimis and commensurate with that of other employees. Plaintiff, therefore, argues that

7

Defendants lacked good cause to terminate him because there are fact questions concerning whether he engaged in the misconduct alleged by his subordinates. As a result, according to Plaintiff, there is a jury question whether he was constructively discharged by Defendants. Finally, Plaintiff states that he is asserting both an Establishment Clause violation of the First Amendment and a Free Exercise Clause violation. Plaintiff argues that the evidence shows that Defendants violated the First Amendment by terminating him for being a non-believer and/or by conditioning his employment on adhering to their religious beliefs. Plaintiff also argues that Hockenberry is not entitled to qualified immunity on his constitutional claims.

### A. Plaintiff Voluntarily Resigned His Employment - Therefore All of His Claims Fail

Count One of the complaint alleges that Defendants terminated Plaintiff's employment without due process of law. Under the Fourteenth Amendment, a public employee under a contract requiring cause for termination, like Plaintiff in this case,[2] has a property interest in his employment which the government cannot terminate without due process of law. See Bailey v. Floyd County Bd. of Educ., 106 F.3d 135, 141-42 (6th Cir. 1997). This generally means that a public employee is entitled to notice of the charges, an explanation of the employer's evidence, and an opportunity to respond with his account of the events. Id. at 141.

---

[2] Plaintiff's employment contract states that it is terminable by agreement of both parties or "in accordance with ORC 3319.16." Doc. No. 14-11, at 3. In turn, Ohio Rev. Code § 3319.16 provides that "The contract of any teacher employed by the board of education of any city, exempted village, local, county, or joint vocational school district may not be terminated except for good and just cause."

8

Count Two alleges that Defendants violated Plaintiff's right to due process by accusing him of criminal conduct when he was terminated. The Due Process Clause protects an individual's good name and reputation from defamation by a state actor, but only if the defamatory statement is connected with the loss of a protected property interest, such as employment. Paul v. Davis, 424 U.S. 693, 711-12 (1976). A claim arising under Paul is referred to as a "stigma-plus" claim. Doe v. Michigan Dept. of State Police, 490 F.3d 491, 501 (6th Cir. 2007).

Counts Three and Four arise under state law and are similar. Count Three alleges that Defendants failed to comply with the procedural requirements of § 3319.16 and otherwise lacked good cause to terminate his employment. Count Four alleges that Defendants breached Plaintiff's employment contract by lacking a good faith, lawful basis for terminating it.

Count Five alleges that the termination of Plaintiff's employment resulted in a taking of his vested contractual rights in violation of the Fifth Amendment's Takings Clause. The Court's initial reaction to this claim, like Defendants', is that the Fifth Amendment clearly does not apply in the context of the termination of Plaintiff's employment because the Takings Clause prohibits the taking of "private property . . . for public use, without just compensation." U.S. CONST. AMEND V (emphasis added). As Defendants point out, even assuming that Plaintiffs' job was "taken" when he was terminated, in no way was his former job taken for "public use." Plaintiff has not cited any cases supporting the notion that the Takings Clause applies to the termination of public employment. The Court, nevertheless, will skip over this problem for the time being because the record shows that Plaintiff's employment was not "taken" by Defendants.

Finally, Count VI alleges that Defendants violated both the Establishment Clause and the Free Exercise Clause of the First Amendment by conditioning his employment on adherence to their religious beliefs.  "Government may neither compel affirmation of a repugnant belief . . . nor penalize or discriminate against individuals or groups because they hold religious views abhorrent to the authorities[.]"  Sherbert v. Verner, 374 U.S. 398, 405 (1963) (internal citations omitted).  Thus, as Plaintiff contends, Defendants violated his First Amendment right to religious freedom if they conditioned his employment on conforming with their views on religion.

As Defendants argue in their papers, however, an implicit if not explicit requirement in each of Plaintiff's claims is that he must prove that they wrongfully terminated his employment.  Defendants point out, however, that Plaintiff resigned his employment and that his resignation is presumed to be voluntary even though, according to him, he was faced with being involuntarily terminated if he did not resign.  The case law is decidedly in Defendants' favor on this point.  See, e.g., Nunn v. Lynch, 113 Fed. Appx. 55, 59 (6th Cir. 2004)("If an employee retires of his own free will, even though prompted to do so by some action of his employer, he is deemed to have relinquished his property interest in his continued employment for the government, and cannot contend that he was denied his due process rights.")(quoting Leheny v. City of Pittsburgh, 183 F.3d 220, 227 (3rd Cir. 1999)).

As Defendants correctly argue, resignations are presumed to be voluntary.  Rhoads v. Board of Educ. of Mad River Local Sch. Dist., 103 Fed. Appx. 888, 895 (6th Cir. 2004). An employee can rebut this presumption by adducing evidence that his resignation was involuntary.  Id.  The employee must show that an objectively reasonable person, under the totality of the circumstances, would have felt compelled to resign if he were in the

10

employee's position. Id. In making this determination, relevant factors for consideration are: 1) whether the employee was given an alternative to resignation; 2) whether the employee understood the nature of the choice he was given; 3) whether the employee was given a reasonable time in which to choose; and 4) whether the employee could select the effective date of the termination.[3] Id. A resignation is not involuntary merely because the employee was given the choice between resigning and being fired, if the employer had good cause to believe there were grounds for termination. Id. In this case, no reasonable juror, after analysis of these factors, could conclude that Plaintiff's resignation was not voluntary.

First, Plaintiff did have an alternative to resigning - he could have faced termination proceedings. As Defendants point out, Plaintiff acknowledged in his deposition that if he had not resigned, they would have had to "prove their case" in order to terminate him. Plaint. Dep. (Doc. No. 13-1), at 181. In other words, Plaintiff appears to have realized that he had the option and opportunity to require Defendants to prove they had just cause to terminate his contract.

Second, and relatedly, Plaintiff clearly understood the nature of the choice he was being given. As just stated, Plaintiff understood that if he did not resign, Defendants would have to establish cause to terminate him. Moreover, Plaintiff understood that by resigning, he foreclosed any further criminal inquiry into his conduct. Id. at 158-59. Plaintiff also secured Defendants' agreement to characterize his resignation as a layoff so that he would

---

[3] A plaintiff can also establish that his resignation was involuntary by proving that the employer obtained it by making a material misrepresentation to the plaintiff. Nunn v. Lynch, 113 Fed. Appx. 55, 61 (6th Cir. 2004). Plaintiff does not make that claim in this case.

11

be eligible to receive unemployment benefits. Id. at 159-60; Ballengee Dep. (Doc. No. 13-3), at 189. Plaintiff, therefore, appears to have understood the options available to him and the consequences that would result from those choices.

Third, Plaintiff had a reasonable period of time to decide whether to resign or face termination. The record shows that Plaintiff did not sign the resignation letter on the day it was allegedly presented to him. Plaintiff, rather, took the letter home with him and did not return it until several days later. During this time, Plaintiff discussed the situation with his wife, she contacted Ballengee to clear up some questions about his insurance coverage and other matters, and he considered whether or not to resign. Plaint. Dep. at 173- 78. Plaintiff also had another two weeks before the School Board met to formally accept his resignation during which he could have withdrawn his resignation but did not. Id. at 182. Plaintiff, therefore, had more than a reasonable amount of time to decide whether to resign or be terminated. Cf. Rhoads, 103 Fed. Appx. at 895 (plaintiff's resignation was voluntary where she had seven hours to choose whether to resign or be fired).

Fourth, and finally, the record is not clear whether Plaintiff was able to select the date of his termination. The effective date on the resignation letter is August 1, 2013, but Plaintiff's resignation apparently would not have been actually effective according to Ohio law until it was accepted by the School Board. See id. at 895 n.4 (stating that under Ohio law "the resignation of public employees is effective upon acceptance of the resignation by the public employer"). In any case, even assuming that Plaintiff was not permitted to select the effective date of his resignation, this factor is not entitled to any significant weight given the substantial amount of time Plaintiff was afforded to make his decision.

On consideration of these factors, no reasonable juror could conclude that Plaintiff's resignation was involuntary - he had a choice whether to resign or be terminated, he clearly understood his options, and he had more than a reasonable amount of time to decide. The fourth factor perhaps slightly favors Plaintiff but it is not sufficient in light of the strength of the other factors for a jury to conclude that his resignation was involuntary. Defendants, therefore, are entitled to summary judgment on each of Plaintiff's claims.

Plaintiff argues, however, that since he denies engaging in the misconduct alleged by Defendants and his subordinates, there are fact questions as to whether Defendants had good cause to terminate him. Therefore, Plaintiff argues, there are factual questions to be resolved concerning whether his resignation was voluntary. It is correct, as Plaintiff states, that an employee's resignation will not be considered voluntary if the employer lacks good cause to believe there are grounds for termination. Rhoads, 103 Fed. Appx. at 895. The Court disagrees, however, that the fact that Plaintiff denies all of the allegations of misconduct means that there are factual questions concerning whether Defendants had reason to believe there were grounds to terminate him. Defendants received a substantial number of complaints about Plaintiff's conduct, many of which were consistent in indicating that he had created a hostile work environment for his subordinates. Obviously, in resolving the complaints, Hockenberry would have had to resolve credibility determinations between Plaintiff and the complainants, but Plaintiff has not shown that Hockenberry lacked a reasonable belief that those complaints could be substantiated. See Rademakers v. Scott, 350 Fed. Appx. 408, 412 (11th Cir. 2009) (employer had good cause to believe it had grounds for plaintiff's termination where it collected fifteen witness statements documenting her misconduct); People of State of Ill. ex rel. Schoepf v. Board of Educ. of Morton High

13

Schools, 606 F. Supp. 385, 390 (N.D.Ill. 1985)(choice between resignation and separation was voluntary because employee could not show his superior knew or believed the reason for the proposed separation could not be substantiated); see also Albano v. Columbus Bd. of Educ., No. 2:14–CV–0379, 2015 WL 1221347, at *7 (S.D. Ohio Mar. 17, 2015) (finding that plaintiff's resignation was voluntary, despite his denials of the misconduct attributed to him, because his attorney advised him to resign, he had two months to consider whether to resign or be terminated, and he agreed to a resignation date). Indeed, the consistency of the employees' complaints would have been and is an important substantiating factor. The record shows, therefore, that Hockenberry had a substantial basis for believing there were grounds for terminating Plaintiff's employment.

Plaintiff also contends that his resignation was not voluntary because he was constructively discharged. A constructive discharge occurs when the employer makes the employee's working conditions so difficult or unpleasant that a reasonable person in the plaintiff's shoes would have felt compelled to resign. Yates v. Avco Corp., 819 F.2d 630, 636-37 (6th Cir. 1987). To establish a constructive discharge, the plaintiff must prove both that 1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, and 2) the employer did so with the intention of forcing the employee to quit. Logan v. Denny's, Inc., 259 F.3d 558, 568-69 (6th Cir. 2001). The mere fact that the employer discriminated against the plaintiff is insufficient to prove a constructive discharge. Moore v. KUKA Welding Sys. & Robot Corp., 171 F.3d 1073, 1080 (6th Cir. 1999) ("The plaintiff must show more than a Title VII violation to prove constructive discharge, so the fact that plaintiff may have proven a hostile work environment is not enough by itself to prove constructive discharge.").

In this case, even if Plaintiff subjectively felt coerced into resigning, as he contends, the record does not show that the Defendants made his working conditions so intolerable that a reasonable person would have felt compelled to resign. As just discussed, the record demonstrates that Plaintiff's resignation was voluntary. In terms of his actual working conditions, the only evidence of discriminatory conduct on the part of Defendants is Hockenberry's alleged comment to the effect that there was no place in the School District for a person with Plaintiff's religious beliefs. This single comment, however, even accepting it was uttered, is insufficient as a matter of law for a reasonable person to conclude that Plaintiff's working conditions were intolerable. See, e.g., Bowman v. Shawnee State Univ., 220 F.3d 456, 463 (6th Cir. 2000) ("Isolated incidents. . .unless extremely serious, will not amount to discriminatory changes in the terms or conditions of employment.").

Finally, Plaintiff cites Ford v. General Motors Corp., 305 F.3d 545 (6th Cir. 2002), for the proposition that an employee can be constructively discharged if he reasonably resigns in the face of his imminent termination. Id. at 554. Ford, however, does not support Plaintiff's argument in the way he supposes. As an initial matter, if Plaintiff's proposition of law were correct, it would obliterate the presumption, discussed above, that resignations are voluntary because an employee faced with the choice between resigning and being terminated could resign and then claim that he was constructively discharged because his termination was imminent. That cannot be the case. Additionally, as Defendants point out, Plaintiff ignores the context in which the Ford Court concluded that it was reasonable for the plaintiff to retire in the face of his imminent termination - the evidence showed that the employer placed the plaintiff in a job which it knew he would have

15

difficulty performing, refused his requests for help or a reduction in his work load, subjected him to heightened scrutiny, and repeatedly threatened him with termination. Id. Thus, according to the Ford Court, it was reasonable for the plaintiff "to preserve his pension by resigning rather than risking imminent termination." Id. In other words, the evidence in Ford showed that the employer made the plaintiff's working conditions intolerable, therefore it was reasonable for the plaintiff to retire. The Ford Court did not, as Plaintiff suggests, hold that it was reasonable for the plaintiff to resign since he was going to be terminated anyway.

## Conclusion

In summary, the record shows that Plaintiff's resignation was voluntary or, stated another way, on this record, no reasonable juror conclude that Plaintiff's resignation was involuntary. Since each of Plaintiff's claims depends upon a finding that Defendants wrongfully terminated his employment, Defendants are entitled to summary judgment on all of Plaintiff's claims.[4] Given, this conclusion, the Court need not address whether

---

[4] The Court recognizes that Defendants did not move for summary judgment on Count VI on the grounds that Plaintiff's resignation was voluntary. Defendants, however, did raise this issue with respect to the other claims and whether Plaintiff's resignation was voluntary is not a claim-specific issue. Plaintiff, therefore, had a full opportunity to marshal his evidence and show that his resignation was involuntarily. Accordingly, to the extent that this results in the Court sua sponte granting summary judgment to Defendants on this claim, Plaintiff was not prejudiced. Cf. Delphi Auto. Sys., LLC v. United Plastics, Inc., 418 Fed. Appx. 374, 380 (6th Cir. 2011)(in determining whether the district court erred in sua sponte granting summary judgment, the court of appeals will "examine[] whether the grounds upon which the district court granted summary judgment were specifically raised by the moving party, or were at least addressed by the party implicitly in the facts and arguments presented in the motion."); Turcar, LLC v. I.R.S., 451 Fed. Appx. 509, 513-14 (6th Cir. 2011) (district court did not err in granting summary judgment on alternative basis because it was "based on issues and evidentiary material that were the same as those set forth in the parties' arguments.") (internal brackets and quotation marks omitted).

Defendant Hockenberry is entitled to qualified immunity.  Accordingly, Defendants' motion for summary judgment is well-taken and is **GRANTED.**  The complaint is **DISMISSED WITH PREJUDICE.  THIS CASE IS CLOSED.**

    **IT IS SO ORDERED**

Date February 1, 2016                                         s/Sandra S. Beckwith
                                                                         Sandra S. Beckwith
                                            Senior United States District Judge